# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

CRIMINAL NO. 06-20062
HON. LAWRENCE P. ZATKOFF

v.

JESSE CRUZ,

    Defendant.
_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on September 13, 2007

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

This matter is before the Court on Defendant's motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29 or, in the alternative, for a new trial pursuant to Fed. R. Crim. P. 33. The Government has responded to the motions. The jury returned a verdict in this case on July 3, 2006. Defendant was found guilty on counts I, IV, VI, and VIII. For the reasons set forth below, Defendant's Rule 29 motion is DENIED and Defendant's Rule 33 motion is GRANTED.

### II. ANALYSIS

Defendant, Jesse Cruz, was convicted on four counts: count I, conspiracy to defraud the United States; count IV, false statements; count VI, false statements; and count VIII, conspiracy to obstruct justice. Defendant argues that there was insufficient evidence to convict him of these four counts. Defendant now moves for acquittal under Fed. R. Crim. P. 29 or, alternatively, for a new trial pursuant to Fed. R. Crim. P. 33.

A.   **Rule 29**

   1.   *Legal Standard*

   Rule 29(a) of the Federal Rules of Criminal Procedure states, in part, that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The Sixth Circuit has held that the evidence need not be direct to be sufficient, and "[i]t is not necessary that circumstantial evidence remove every reasonable hypothesis except that of guilt." *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984). The defendant bears a heavy burden when challenging the sufficiency of the evidence, and the Court must view the evidence in the light most favorable to the Government. *United States v. Davis*, 397 F.3d 340, 344 (6th Cir 2005). Furthermore, when determining the sufficiency of the evidence, the Court must not assess the credibility of the witnesses. *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994).

   2.   *Count I*

   In count I, the Government alleged that Defendant conspired with his former employer, codefendant Elena Szilvagyi, to be the owner "on paper" of Autumn Ridge, a health care company that would in fact be owned and controlled by Szilvagyi. When Autumn Ridge was started, Szilvagyi owed Medicare a debt of $7,000,000. Szilvagyi testified that she developed a plan with her advisors to operate health care companies through other people. The companies could not be in Szilvagyi's name because of the debt she owed to Medicare.

   Szilvagyi testified that she had a meeting with several of her employees and told them of a plan that would involve Szilvagyi putting up money to start health care companies that would be in the employees' names. The companies would eventually be sold, and the employees would receive $50,000 and Szilvagyi would receive the rest of the proceeds. Szilvagyi testified that Defendant

agreed to participate in the plan. Szilvagyi and her father provided $67,000 to start Autumn Ridge. Defendant did not contribute any of his own money, and did not have any experience in running a health care company.

The origin of the $67,000 is somewhat complicated. Szilvagyi's company Prime Care owed Medicare $7,000,000. Some of Prime Care's assets were used to start another company, Health Care Partners. Heath Care Partners then transferred $67,000 to Szilvagyi and her father, who then transferred it to Autumn Ridge. The money was characterized as a loan. Szilvagyi testified that the money was transferred in several steps because it was "cleaner" to do it that way.

Defendant points to a portion of Szilvagyi's testimony where she stated that she did not tell Defendant that the reason they started Autumn Ridge was to avoid paying back Medicare. However, as noted above, Szilvagyi testified that Defendant agreed to participate in a plan that involved him "fronting" a health care company for Szilvagyi. The Court agrees that the evidence against Defendant is far from overwhelming; however, the Court must view the evidence in the light most favorable to the Government and must not evaluate the credibility of witnesses. Thus, the Court rules that the evidence was sufficient to support a conviction on count I.

3. *Count IV*

In count IV, the Government alleged that Defendant caused a false statement to be submitted to the United States Department of Health and Human Services ("HHS"). During the process of starting Autumn Ridge, Defendant had to certify to HHS that Autumn Ridge met certain capitalization requirements. As part of this certification, Defendant stated that Autumn Ridge met the capitalization requirements and that no more than 50% of the funds used to meet those requirements were borrowed.

During trial, Szilvagyi testified that she supplied all of the funds to start Autumn Ridge. Defendant invested nothing. Furthermore, Szilvagyi testified that in January 2001, she caused a bank

3

account to be opened in the name of Autumn Ridge at National City Bank and deposited funds in order to satisfy Medicare's capitalization requirements. Szilvagyi also stated that she initially learned of these requirements when Defendant gave her a letter that he received from Medicare explaining the requirements, including the fact that no more than 50% of the funds could be borrowed. In addition, Defendant sent Szilvagyi a letter regarding the Medicare application for provider status indicating that he was aware of the capitalization requirements. Notwithstanding this awareness and the letter from Medicare, Defendant faxed a letter to the Medicare intermediary stating that Autumn Ridge met the capitalization requirements and that the funds were "free from encumbrances." Finally, the Government's evidence showed that Defendant reviewed, signed and submitted an application for provider status to Medicare, which stated that he was the owner of Autumn Ridge and concealed the fact that he borrowed the funds to start Autumn Ridge from Szilvagyi.

As with count I, the Court agrees with Defendant that the Government's evidence is not overwhelming. Still, accepting Szilvagyi's testimony as true, and viewing it in the light most favorable to the government, the Court finds the evidence was sufficient for the jury to find Defendant guilty of making a false statement to HHS.

  4. *Count VI*

In count VI, the Government alleged that Defendant made false statements to the federal agents who were investigating the formation of Autumn Ridge. While investigating Szilvagyi's involvement in Autumn Ridge, the investigating agents interviewed Defendant on April 30, 2003. During that interview Defendant told the agents that he had paid Linda Ryan to perform a 504 self-evaluation of Autumn Ridge as part of the Medicare application. However, Linda Ryan never actually evaluated Autumn Ridge.

The evidence at trial revealed that Defendant met with Linda Ryan prior to forming Autumn

4

Ridge and asked her to perform the 504 self-evaluation. Thereafter, Linda's husband contacted Defendant and gave him a price for her services and Defendant, in turn, asked Szilvagyi if that price was reasonable. Szilvagyi indicated that she thought the price was not reasonable and told Defendant not to pay for Linda Ryan's services. Defendant had no further contact with Linda Ryan. However, James Ryan, Linda's husband, testified that Defendant called him in August 2001, after their initial meeting, to find out information regarding the 504 self-evaluation necessary to complete the application for Medicare. During this phone call, James Ryan told Defendant that Linda had not done any work for Autumn Ridge. When Defendant asked James if he was sure that Linda had not done any work, James replied affirmatively. Moreover, Defendant's application to Medicare indicated that the 504 self-evaluation was complete and had been performed by Linda Ryan. Finally, the investigating agents testified that Defendant appeared nervous during the interview in 2003 and interpreted this as a sign that he was not being truthful with them. Szilvagyi testified that Defendant called her during and after this interview and told her that he had lied to federal agents about Linda Ryan's work for Autumn Ridge and asked her to fix it. Szilvagyi's phone records indicate that she did in fact speak with Defendant at that time.

As with the previous two counts, the Court agrees that the Government's evidence was not overwhelming. Nevertheless, when viewing the evidence in the light most favorable to the Government, the Court concludes that the evidence was sufficient to convict Defendant of making a false statement to the investigating agents.

    5.    *Count VIII*

In count VIII, the Government alleged that Defendant conspired with Szilvagyi to obstruct a criminal investigation. Szilvagyi testified that Defendant called her on April 30, 2003, and told her that he had told investigators from HHS that he had paid Linda Ryan $200 in cash to review Autumn

5

Ridge's disability policies. Linda had in fact not done the work. Szilvagyi testified that Defendant was frantic and asked her to "fix" the situation. Szilvagyi told Defendant that she would call the Ryans and see what she could do. Szilvagyi then talked to Mary Ann Ryan, Linda's mother, and asked her to convey an offer to Linda. Szilvagyi offered to pay Linda either $250 or $1000 if Linda would say that she had done the work. Szilvagyi then called Defendant and told him what she had done. Szilvagyi testified that Defendant was grateful and thanked her.

The Court again agrees that the evidence against Defendant is not overwhelming. However, accepting Szilvagyi's testimony as true, and viewing the evidence in the light most favorable to the Government, the Court finds that there was sufficient evidence to convict Defendant of conspiring with Szilvagyi to cover up his lie to the HHS investigators regarding Linda Ryan.

Based on the forgoing analysis, the Court finds that the Government presented sufficient evidence to convict Defendant as to all four counts. Consequently, Defendants motion for acquittal under Rule 29 is DENIED.

**B. Rule 33**

*1. Legal Standard*

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the trial court may vacate any judgment and grant a new trial if the interest of justice so requires." Defendant argues that several alleged instances of prosecutorial misconduct by the Assistant United States Attorney ("AUSA") warrant a new trial. The most significant allegations involve violations of Defendant's Fifth Amendment rights.

*2. The Effect of the AUSA's Comments*

Defendant did not testify or present a defense in this case. During the course of the trial, the AUSA made several comments that constituted indirect references to Defendant's decision not to

testify or to present a defense. The following exchange occurred during defense counsel's cross-examination of Government witness Darren Bartnik:

> Defense counsel: Just asking if that refreshes your memory. Now, assuming that's all true which that would be Jesse's belief, let's assume for a second Jesse believed that as well, that the form was completed, Elena completed it and he submitted it because she asked him to because everything was done. And also if you recall there was some testimony in regards to – well, strike that. Assuming Jesse believed that the form was completed because Elena gave it to him and said it's all ready to be submitted, when that form was submitted by Jesse, in his mind it was accurate. If in his mind it was accurate and you asked him the question, Mr. Cruz, did Ms. Ryan help you and assist you with this and he said yes, he wouldn't have been lying to you if he said, yes, Ms. Linda Ryan assisted with the 504 form, correct?
>
> AUSA: Your Honor, I have an objection. First of all, I couldn't follow that question-
>
> Witness: I can't either.
>
> AUSA: - given its length. But second of all, that's okay. I ask long questions, too. My main concern, however, is that in the middle of that question was the assertion, because that's Jesse's belief, *Jesse hasn't testified yet*. And it seems to me it's okay if he asks a hypothetical question but *it doesn't seem like he can state what Jesse's beliefs are until Jesse takes the stand*.
>
> Defense counsel: Your Honor, I object to those references. One, those are references that shouldn't be made by the government in regards to Fifth Amendment issues.
>
> The Court: I fully agree. Do you want a jury instruction?
>
> Defense counsel: I may ask for one on that, yes, your Honor.

Tr. July 2, 2007 at 4 (emphasis added). The AUSA's comments constitute an indirect reference to Defendant's decision not to testify.

The AUSA made other references throughout the trial that could be construed as indirect comments on Defendant's failure to present a case. At one point the AUSA told the jury that he expected that the "defendant will offer an explanation for that and you will have to decide if it's plausible." The AUSA also referred to a potential defense witness, saying "I think we are going to hear from Mr. Bellman, possibly." These comments are indirect, but still had the potential to create

7

in the jury the expectation that Defendant would present a case.

The Sixth Circuit has prescribed a four-factor test for courts to use when evaluating indirect references to the defendant's failure to testify:

> 1) Were the comments 'manifestly intended' to reflect on the accused's silence or of such a character that the jury would 'naturally and necessarily' take them as such;
>
> 2) were the remarks isolated or extensive;
>
> 3) was the evidence of guilt otherwise overwhelming;
>
> 4) what curative instructions were given and when.

*Lent v. Wells*, 861 F.2d 972, 975 (6th Cir. 1988).

"The court will not find manifest intent if some other explanation for the prosecutor's remarks is equally plausible." *Id.* The Court finds that the AUSA's comments were not manifestly intended to reflect on Defendant's silence. The AUSA's comments that most directly referenced Defendant's silence were made as part of an objection to a lengthy question from defense counsel. The objection was misguided: the question was in fact couched as a hypothetical (albeit a lengthy one) that the AUSA conceded was acceptable. In addition, it was clearly improper for the AUSA to refer to Defendant testifying: any concern the AUSA had along those lines should have been presented to the Court outside of the presence of the jury.

Furthermore, the AUSA's comments were relatively isolated. Aside from the comments in his objection, the AUSA made two additional comments that were related to the Defendant's presentation of a defense. However, these comments were made during the course of a four day trial that was, for the most part, conducted in a professional and courteous manner. Thus, the Court concludes that the AUSA's motive for making the comments and the frequency of the comments do not, without more, compel the Court to grant Defendant's motion for a new trial.

8

Nevertheless, the Court finds that even though the AUSA did not manifestly intend to his comments to reflect on Defendant's silence, the jury would naturally and necessarily take the AUSA's comments as a reference to Defendant's decision not to testify. Principally, Defense counsel posed a question to the witness based on Defendant's theory of the case. The AUSA's comments during his objection gave the jury the impression that Defendant's theory of the case could not be credited unless Defendant testified. Thus, the jury would naturally and necessarily take the comments as a reference to Defendant's failure to testify and would hold that fact against him. Further, the Court finds that the AUSA's reference to Defendant offering a plausible explanation for his behavior and Defendant's potential defense witnesses, although indirect, still had a strong possibility of creating an expectation on the part of the jurors that Defendant would present a defense. Thus, the AUSA's comments created a strong possibility that the jury would hold Defendant's failure to present a case against him. As such, the nature of the AUSA's comments weighs in favor of granting Defendant's motion for a new trial.

Moreover, as noted above, the evidence against Defendant was far from overwhelming. The primary evidence against Defendant was the testimony of codefendant Elena Szilvagyi. As stated in the Court's sentencing opinion for Szilvagyi, the Court was not impressed with her testimony. The Court finds that the prejudicial nature of the AUSA's comments combined with the fact that the Government's case against Defendant was far from overwhelming made it likely the jury would give improper consideration and weight to the fact that Defendant did not testify or present a defense.

Finally, the Court did issue a jury instruction regarding Defendant's Fifth Amendment rights. The Court instructed the jury that:

> A defendant has an absolute right not to testify or present evidence. The fact that Defendant did not testify or present any evidence cannot be considered by you in any way. Do not even discuss it in your deliberations. Remember that it is up to the

9

government to prove the defendant guilty beyond a reasonable doubt. It is not up to the defendant to prove that he is innocent.

However, this instruction could not undo the prejudicial effect of the AUSA's statements, similar to the way the Government's request for a reduction in sentence at Szilvagyi's sentencing could not undo the crimes she had committed. The AUSA recognized this fact while explaining the Government's position that the Court should consider Szilvagyi's cooperation following her incarceration on charges in the Western District of Michigan, stating, "we can't put the genie back in the bottle." In other words, the damage had already been done.

As discussed above, the AUSA's comments had a strong possibility of convincing the jury that Defendant must testify and present evidence in order for Defendant's theory of the case to be credited. Additionally, the AUSA's comments regarding Defendant's silence occurred in close proximity with Defendant's decision not to present a defense. In contrast, the Court's instruction occurred the following day, giving the jury time to absorb the prejudicial nature of the AUSA's remark. These circumstances, coupled with the less than overwhelming evidence against Defendant, lead the Court to conclude that the interests of justice require a new trial. Thus, Defendant's motion for new trial pursuant to Rule 33 is GRANTED.

### III. CONCLUSION

For the above reasons, Defendant's motion for acquittal pursuant to Rule 29 is DENIED and Defendant's motion for new trial pursuant to Rule 33 is GRANTED.

IT IS SO ORDERED.

s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated: September 13, 2007

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on September 13, 2007.

s/Marie E. Verlinde
Case Manager
(810) 984-3290
